Good morning, your honors. I introduce the court to Ms. Farrington. My name is Richard Kortner and I represent Ms. R. Maad in this case. Mr. Maad was convicted in February 4th, the date his trial started, 2002, by accounts of various false statements and financial statements and loan applications that he had been involved in with his business, which was a printing company here in Anchorage. I think this case presents squarely with this court the issue of what steps the district court should have taken when there's adverse and prejudicial pretrial publicity to assure Mr. Maad or any citizen of a fair trial when there is this type of publicity. And it's our position that especially when there's a scientifically conducted public opinion survey that demonstrates this type of adverse impact of publicity, that the court should look at that and consider a change of venue or some types of protections to protect Mr. Maad from that publicity. And it's our position that Mr. Maad did not receive a fair trial in this case. And we think that the court abuses discretion by not considering, fully considering the public opinion survey, by not continuing the trial date in order to conduct an evidentiary hearing on the basis of the survey. And how far do you go with the survey? I'm interested in that. If you have a survey and it says that 60% of the people are biased or have preconceptions or something, and the judge says, all right, I'll draw a jury from the other 40 and satisfies himself on warrant here, they've done that, where does that leave you? Well, that's a good question. I don't think there's any bright line rule on that. I think the important objective is to measure the impact of pretrial publicity before trial and then calculate the measures to protect from that. For example, and this has been a history in some cases in Alaska where we've had evidentiary hearings on pretrial publicity with this type of public opinion survey. And in fact, the government had a chance to bring in other experts on that methodology of doing that public opinion survey, and the courts have actually granted the change of venue when they consider that. In this particular case, we wanted the court to consider the measure of the impact of that publicity in this case and consider just moving this case to Fairbanks, which is a 45-minute plane ride, or to Juneau, not even outside the district because we thought that this survey demonstrated that there was a substantial impact in this community here in Anchorage, but it probably wouldn't have had nearly any impact in Fairbanks or Juneau because of the nature of this case. And I think that I want to illustrate the nature of this case, because on his face, these are five counts of false statements and loans. Mr. Ma had a history with his bank as a businessman of 20 loans, and this is the 21st loan that he had had with this bank. And he was even current on this particular loan. But what made this case unusual is that it happened right after September 11. After September 11, 2001 and the tragedy in this country, Mr. Ma came out as a public figure within a few days as an Arab-American who spoke for tolerance. And he was in the local newspaper. He was on radio, and he became a public figure at that time. But within approximately 10 or 11 days after September 11, his business was vandalized, and it was investigated as a hate crime. So there was a lot of publicity about Mr. Ma being a victim, being a voice for tolerance. He was a public figure. Let me ask you, looking at the standard in the Ninth Circuit, two things occur to me that you need to address. I think the case presents unusual circumstances because of the timing post-9-11. But two aspects of our case law require us to look at whether the coverage was predominantly factual and whether there was a circus atmosphere. And I would appreciate it if you could address whether you can overcome those prongs of the Red Wall test. Well, I think, first of all, the factual nature of the publicity is definitely an issue in this case because we're not concerned about the publicity about the charges of making false statements in a loan application with the bank you've been dealing with for years. What we're concerned about in this particular case is the publicity that was not factual, would not be admissible at trial, is that he was labeled as the suspect in his own vandalism. Now, this had a tremendous impact on this community because he had gone in the transition of several months from a voice for tolerance, from a victim, to, I would say, a traitor. And when he was arrested on these charges, the government lawyers labeled him a prime suspect in his own vandalism. That changed the whole nature. Those are facts. If 90 percent of the facts are true, that 10 percent that says he is a suspect in his own vandalism had all the impact. Which was not untrue. Pardon me? He was a suspect in his own vandalism. Was that inaccurate? Well, no. The government suspected him of that. They never charged him. They never have charged him. He was, in fact, innocent of that. But he couldn't defend those suspicions that were out in the newspaper in this trial. And that was the whole where the factual disparity comes in. And because the nature of the publicity then is he went on this transition from a victim to a traitor. In fact, there are even references in some of the initial court hearings that we tried to put in the record about Osama bin Laden. There was a reference in there. But it was clear that he was seen as not only a suspect, but taking advantage of this tragedy in this country for his own economic gain. And that was what painted him and what made such a prejudicial feel in this community. And in order to demonstrate that, it's, I think, difficult in a federal courtroom with a judge-conducted voir dire to really get to the basis of what have you heard about this case? What do you think about Mr. Ahmad? But if a scientific poll is conducted, scientifically, with the same pool of people that would be here for jury duty, where they can openly share what their feelings are and what they know about this case, then I think that's enough to demonstrate that the judge should take some particular precautions in this particular case. And that's what wasn't done for all the precautions we asked for. We asked to go to Fairbanks, Virginia. We asked for individual voir dire, where perhaps instead of in a group setting, we could ask jurors separately with the attorneys participating what they've heard and can they set that aside. We could maybe have a questionnaire presented to the jury ahead of the trial. But this case proceeded on what we characterize as a rocket docket. But this went to trial without any continuances. And part of the circumstances or the factors for presumed prejudice is the time. And this case went to trial. There were 22 days elapsed on this being trial filed. There was no compelling reason for this case, with this nature of this publicity, to go to trial this quickly. There was no compelling reason not to at least hear from the experts that were trying to measure the impact of this. And I think that that public opinion survey demonstrated a number of things. First of all, one of the factors in there is the high awareness of this case. And between Mr. Ma being a victim of vandalism and being a suspect and also the charge in this case, there was 85 percent awareness in that public opinion survey about Mr. Ma. Now, I don't think that was reflected in the Bourdier process in this case, but that was, I think, a legitimate measure of how publicly aware this case was in this community. There was a 75 percent rate of people who knew he had been arrested and had been labeled a suspect. And most importantly, according to this survey, which I think was scientifically conducted and I would suggest was an accurate reflection in this community, 55 percent of these people who would be eligible for jury duty in this courtroom had a presumption that Mr. Ma may be guilty before they even got here. Now, if that's true, then we've gone from a presumption of innocence to a presumption of guilt because of this nature of the publicity in this particular case. And that's why we think that this case is an extraordinary and that the district court should have considered these factors and taken precautions to guarantee Mr. Ma a fair trial. I think the poll also, the survey and the findings we made with the court, demonstrated that there were 124 stories related to Mr. Ma between September 11th and within four months of mid-January when we did that, that we prepared that information for the court. That's 124 stories within, I would say, a relatively small community here in a four-month period. That's one a day. And I think that with that kind of publicity in the public mind, the spotlight on Mr. Ma in the public mind, that deserves at least some precautions and a continuance of the trial date, perhaps, until some of the adverse impact could diminish. But that's the nature of it. Was the continuance asked on that ground? I know you asked for a continuance in order to refine your study or to support it. But did you ask for a continuance as one of the, did you ask for a change of venue? Did you ask for just a continuance to? Yes, we asked for a continuance, I think, twice. And I think both because we also were, had to really struggle and hustle to get a financial expert to come in and testify about the nature of these financial statements. And we had some scheduling conflicts where it was really difficult within this timeframe. And so, but we were able to, we asked for a continuance to enable us to thoroughly explore that and have an expert available to testify. We also asked for a continuance because, specifically because, we wanted to present the, as witnesses, those who conducted this public opinion survey. And what's disturbing about this case is that the first ruling or the original report and recommendation to the magistrate judge was before we could even get the survey complete. We have some preliminary findings that we submitted to the magistrate court. And the court made its ruling that we hadn't proved the circus atmosphere or the prejudicial standards, the standards for presumed prejudice in our preliminary results. And then we had to, by the time we got the complete survey that's in the record here to the court, it was addressed in the final report and recommendation. And then there's just a one-page minute order from the district court affirming, or basically adopting the report and recommendation. And if you wanted to get to your question about the circus atmosphere, I think that the presumed prejudice, that circus atmosphere, goes back to the Sam Shepard case. And, I mean, we don't see that anymore. But I think the other important factors that this court has looked at for presumed prejudice was the timing, was the prejudicial nature, and whether it's factual as can be assumed at trial. And let me ask you about that, because I think in reading these articles, they are factual in nature. In other words, it is a fact that the prosecution suspected him of the other involvement. So I'm wondering whether the standard we've been using actually quite applies to this case, and whether the effect has to be inflammatory, or the article itself has to be prejudicial and inflammatory. Do you agree on that? Well, I think both. I mean, I think you need to look realistically at the impact. I mean, for example, if the government were to say, I suspect that Mr. Mott has direct connections to Osama bin Laden or Saddam Hussein, well, maybe for some reason they think that, for whatever reason. Maybe because he's an Arab American, they might suspect that. Maybe because he was born in Syria. Maybe they think that. Now factually, that may be true, they think that. Maybe they think that of every Arab American. But if they say that, especially if a public figure says that, factually that's true, that they think that. But the reality is it's not true. How do you prove that to a jury that's already been poisoned in the media? You know, you can't defend those charges. Mr. Mott, in this trial with this jury, couldn't defend that he was innocent of their suspicions of vandalism. And it's our opinion that that was the driving force behind the verdicts, that you can't erase that kind of impact on this jury when they were considering a different issue. But with that in the back of their mind, you can't un-ring that thought. And so I think that's the important factor, is the prejudicial impact on the jury. And that's what a public opinion survey measures. It measures the impact on the community, on those who might be available for jury duty. And if you were to conduct any type of a business and want to know what the community feelings were, you probably wouldn't bring a bunch of people in the courtroom and have a judge ask them, can you be fair, how do you feel about this? I think we probably want some type of a scientific study to be done to really measure that. And that's what we ask the court to consider here. And without the court taking the precautions that we requested, without any compelling reason not to, we're asking that this conviction be reversed. When was that statement made about Mr. Mott being compared to Osama bin Laden? It wasn't necessarily – it was a reference to Osama bin Laden. He wasn't compared to Osama bin Laden. I think it was at a detention hearing when – I mean, to my experience, the businessman with his own business who has these type of financial misstatements wouldn't be arrested and incarcerated. And the government wouldn't fight against the appointment of counsel or certainly detention. But in this case, the government attorney made a comment that, well, he could be a flight risk. You know, Osama bin Laden can change his appearance. We haven't been able to find him. So it wasn't a direct reference. It was just a kind of indirect reference. Just mentioning that name in this detention hearing for Mr. Mott on this type of charges, what rationale would there be? I don't know. But the impact, I think, is what's important. But the major impact in this was the day he was arrested, for no reason related to this case, the government attorney says, he is our prime suspect in this hate crime investigation that all you people have been making contributions to in order to, you know, to help this victim of a hate crime and his employees. And that was completely unnecessary for the detention hearing, but completely poisoned, in our view, the community for the trauma. Was that comment about Osama bin Laden reported? I don't think that was reported. I don't think that particular... You probably didn't have plenty to judge. Probably not, but I think it was the primary inflammation of the community was the fact that he was a traitor, that he took advantage of this tragedy in this community to his own financial gain. Well, that I understand. That's not my definition of treason, but I understand it's considered very reprehensible. How many of the jurors actually in the panel had known about the case, heard about it, read about it? Surprisingly few, I think. And considering what I know looking at this community and what this public opinion survey demonstrated, it is shockingly few people have ever heard about this case. And I think that's because in this day and age, judge-conducted voir dire is not the best way to find out exactly what people may think about or have heard about a case before they come into a court, and especially with a case of this nature. So I think that that's not a true reflection of the impact on this jury from pretrial publicity. But in the record, in the jury selection process, there was surprisingly few people who could even remember anything about this case, even though the poll reflects there's 85% awareness in the public. And that was a month before trial? Yes. It was only up until early January that the news reports were catalogued, is that correct? To January 11th. And the trial started February 4th. So basically three weeks later. We were picking a jury when this... But there wasn't really evidence in the voir dire, whether people believed it or not, of actual even acknowledgment or cognizance of this publicity. Is that correct? Right. I would concede that I don't think we could show actual prejudice with this jury selection process, but that we demonstrated, or should have had a chance to demonstrate, presumed prejudice with the public opinion circuit. And I think that the Ninth Circuit laws, you can show either presumed or actual prejudice. And our argument is for presumed prejudice being demonstrated, or at least not having the opportunity to prove it to the court. What do we do with the district judge's gatekeeper function, in terms of surveys and also evaluating surveys? Do we look at his evaluation of this under an abusive discretion standard? Yes. I think that because of all the particular extraordinary circumstances of this case, and all the remedies and alternatives that we suggested that were denied, and the fact that there was no compelling reason to deny those or to go forward to trial. I think that's an innate abuse of discretion. You're talking about the questionnaire? Well, the individual questionnaire prior to jury selection. Yes. The individual voir dire. I think primarily just having the trial held within the district at a different courtroom, in a different community, in Fairbanks or Juneau. I mean, there's no compelling reason why that was not a practical solution to protect Mr. Mott. But when the court takes none of those measures that we suggested, and the alternative to assure Mr. Mott a fair trial this shortly after all this publicity, that's an abuse of discretion in our position. How many newspapers are there in Anchorage? One. One. Anchorage Daily News. And I'm out of time. Thank you. Good morning, Your Honors. May it please the Court, my name is Joanne Farrington, and I'm an Assistant United States Attorney here in the District of Alaska. I'll talk with you today about three issues raised by the defendant. The first is change of venue. The second is jury selection procedures. And the third is waiver. The defendant claimed pretrial that publicity had unfairly prejudiced him in compromising his Sixth Amendment rights, and as a result he requested a change of venue. No, I can't really hear you that well. I'm sorry, sir. Is that better? You can actually quote that. Yeah. Okay. The defendant requested a change of venue pretrial, and in the alternative, he requested that individual voir dire be conducted by the counsel rather than the court, and that an extended juror questionnaire be used in the course of jury selection. The trial court denied all of these motions and proceeded with a very careful voir dire of the jury pool as trial commenced. At the conclusion of jury selection, there was no renewal of the request for change of venue. There was no objection to any of the seated jurors for cause, and there was no suggestion that the voir dire had been in any way inadequate to disclose any juror biases. I would suggest to the court that under these circumstances, this effectively amounts to a waiver of the defendant's objections pretrial to the issue of whether there was a problem with the jury here. And on that point, I would like to expand the government's brief somewhat, but the defense argued that the standard here was whether there was an abuse of discretion in the court's denial of these motions. I think that under the facts of this case, in fact, the standard is that the defendant waived those objections, and absent clear error, this court should not reverse. When the trial court can't be said to have committed fatal error in this case, when it failed to sua sponte grant relief based on unspoken objections at the close of jury selection. And the alternative that might help... Do you have any case that suggests that if you raise a presumed prejudice claim and don't renew that after jury selection, that it's a waiver? I don't, but I would compare that situation to an evidentiary motion in Luminae, Your Honor, where a judge rules pretrial that it appears, given all the facts that the evidence published should come in, then in the course of trial, with a fuller development of the particular relevance of the facts, the defense must raise the objection again in order to preserve that point. There are really two points. I can understand your point that he's waived objection to the procedures that were used to inquire the jury. As I understand his argument, it's that the effect of publicity had so inflamed the population that you can't really believe the juror's answer. It's the presumed prejudice, not the actual demonstration of prejudice. And I don't know that he's waived his presumed prejudice argument. I think that's true, Your Honor, and I think that there certainly are situations pretrial where a trial judge could properly exercise his discretion based on the facts and circumstances of a particular case and decide that there is presumed prejudice, and without even calling a jury pool or conducting voir dire, decide that moving the trial is the best course. I'm not aware of any case in which it was held to have been an abuse of the trial judge's discretion to decide to give voir dire a chance, to have a jury pool brought in, to take a look at the jurors, to listen to their answers, How many of the impound jurors knew something about this case, or said they knew something about this case? I actually think that the numbers were a little higher than the defendant recalled. As I look over the record, it looks to me that ten of the seated jurors had some sort of recollection. Many of them couldn't remember what it was they recalled, but they thought they'd heard something about the defendant or something about the case at some point in the past. But, of course, that's not a disqualifying factor for a juror. At that point, the judge... But as the evidence comes in, then their memories are refreshed, and they start, oh, yeah, I've read about this or heard about that. That happens. That's true, and that is why it is the judge's responsibility and very capably carried out in this case for the judge to then proceed to inquire more carefully. If a juror indicates some contact with the publicity in this case, it was the judge's responsibility, and he did, inquire further as to what the juror might remember and whether the significant factor is whether, in any case, he has preconceived views about the case and whether he believes that he will be able to listen to the evidence, decide the case based on the evidence, and listen to the judge's instructions. Let me ask you this. Was there any reason or need for your office to make the statement, public statement, that the defendant here and his wife were, whatever it was, prime suspects in the hate crime or vandalism? And at the same time, they were indicted on these bank fraud charges? What was the need for that? Your Honor, those facts were brought out in the course of the pretrial detention hearing. The issue was whether or not the defendant should be detained pending trial. The hearing was being conducted, and the government did express a concern that, given the fact that the defendant was under suspicion for another crime, was being investigated, and knew that he was being investigated, that his risk of flight was therefore enhanced. That was a legitimate point for the government to bring to the court's attention at that point. Well, that got out into the media, did it not, that statement? It was an open hearing, Your Honor. Yes, so that's pretty damaging. It was potentially damaging. Well, more than potentially damaging. It's damning information, isn't it? There are often facts brought out in the course of a pretrial detention hearing that are potentially damaging to a defendant. Some of those end up being reported, and that is the point at which it is, I agree, the judge's responsibility to explore the impact that that publicity may have had. Did you make the statement? No, Your Honor. Could you handle it? But whoever did had to know it would have a dramatic effect. And that is a balance that has to be weighed in the course of a pretrial detention hearing. There are many facts that may be brought out in the course of such a hearing that may end up not being admissible at trial and may be prejudicial. They nevertheless are legitimately brought to the attention of the court. I don't think it's a question of the prosecutor's bad faith in bringing this forward and making a legitimate argument. The question is what impact it might have had on the jury pool. Normally having a defendant's prior criminal background or even suspected criminal background is not enough for a change of venue under our cases. But I'm wondering here, the difference is most of those cases didn't involve the aftermath of 9-11 or the kind of public fervor that was surrounding that event. How does that change the calculus here from the ordinary case where your office might be in this situation? Well, I think that that was a very significant factor, Your Honor. It was one that all parties involved were quite aware of and it was one that was very carefully explored in the course of voir dire. In fact, I would commend to the court the court's handling of the entire process of jury selection here in any case where there's been significant publicity and when there might be a legitimate question as to potential juror prejudice. Do you think that the fact that there might not be enough to show actual bias based upon the jury that was seated somehow displaces a presumed bias claim? Well, I think in this case it does. I do agree that there are circumstances and the famous trilogy of Supreme Court cases are probably three pretty good ones where even though a seated jury perhaps gave the right answers, they said, yeah, we can be fair, yes, we can listen to the judge's instructions, yes, we can set aside our prejudices, where given enough of a circus atmosphere, as the court described it, that legitimate skepticism is warranted. That just isn't the case here, Your Honor. There were no community calls for vengeance. There was no trumpeting of headlines announcing guilt. There were no confessions broadcast to the jury pool. It wasn't a lured crime that had been followed in grim detail by flamboyant press. It wasn't like that. You had a situation here. I wasn't here. I just picked up from these pleadings where you had 9-11 and you had this vandalism situation and then they signed, we hate Arabs, and then the community coming together and saying, you know, not in our town, and then raising a lot of money, like, what, $80,000 or more to help them out, and the F.D.I. comes in and that's publicized and this is, you know, a hate crime, and then, lo and behold, the news gets out that the government is saying that Mr. Mott is a crime suspect in this hate crime and in this vandalism. I mean, he's someone that people had a lot of faith in, that the community was demonstrating that it was a good community, an American community, a patriotic community, and a community that valued other people's views and their backgrounds, and then the whole thing blows up and people come in, they want their money back, and people thought they were deceived and this was some kind of a scam, and the whole thing just didn't happen that way. I mean, I'm not a script writer, you know, or whatever, but am I wrong? I wasn't here either, Your Honor, so I am also somewhat relying on my reading of the record, and it does appear that this was an intense period of time for Anchorage, and that this was a significant event in those post-9-11 days. That's why it became an issue that the judge had to deal with, and that's why it became an issue that he dealt with with extraordinary care. He spent a day and a half first questioning the jurors himself and then giving counsel free reign to ask every juror any question that he wished, to explore any issue that he had any concerns about. Who asked the question? Both the trial judge and counsel for the defense and prosecutor. The judge asked an initial range of questions, and then any juror that either defense counsel or the prosecutor wished to question further was brought back for further individualized questioning, and I believe that every juror seated, in fact, asked an extensive range of questions, and answered an extensive range of questions. With respect to- This was on television? There was television coverage. As I understand it, there was some television coverage spotty through the fall, and there was quite a bit of press right about the time of the detention hearing. I think that two months before trial, right around the time of the detention hearing, there was press coverage, both television and newspaper, and the jurors varied in their memories. Some tended to watch the evening news. Some tended to read the papers. Others said, I never pay any attention to the news at all. But looking at the jurors who were seated, although a majority of them did recall some exposure to the story, none of them expressed any views at all. The most common response to the question about their views was, but that doesn't have anything to do with the charges here, as I understand them, which is absolutely accurate, and all of them were questioned extensively and accepted by the defense as jurors without objection. There was one question that I wanted to address, the continuance issue, Your Honor. I believe that the continuance was not requested pre-trial in order to give the effects of the publicity a chance to dissipate. That is a tool that is available in his discretion to a trial judge to deal with the effects of publicity if necessary. In this case, the judge decided it was not necessary, and I think that the results of the voir dire bore him out. But in fact, the continuances that were requested were requested in order to help ensure that a defense witness wouldn't have to put off his vacation in order to testify. In fact, that witness did testify on schedule and without interfering with his own personal life. Which witness was that? I'm sorry? That was the defendant's accountant who was going to testify, who did testify, actually, as to the state of the books. And the continuance was also requested in order to flesh out and more fully develop the public opinion poll. In fact, the public opinion poll was completed. It was submitted in complete form. And the judge said on the record that he had read and considered the final report. But it came in. It came in late, but before the judge issued his final ruling on that. It came in after the magistrate issued his report recommendation. The timing was that the initial report, which I believe contains all of the factual information that the final report contains, was available to the magistrate court before he wrote his initial recommendation. Then before the final recommendation was submitted, the final report was filed and was considered. By the magistrate. That's right. And explicitly by the trial judge as well, who reviewed the magistrate's findings, reviewed the report, reviewed the newspaper press coverage report, and concluded that there was insufficient showing of presumed prejudice to warrant a change of venue at that time. Although he expressly made his ruling preliminary and subject to reconsideration, if the voir dire showed that there was more widespread juror prejudice than he anticipated. If there are no further questions, I think I will conclude there. Thank you, Your Honors. Thank you. Mr. Gertner. Your Honors, I know I've used my time, but I just want to make a comment about the waiver. As I understand the law. Well, this is, you know, we only use a certain mechanical procedure to allocate time. But this case certainly warrants more time than was allocated to it. Well, thank you, Your Honor. But I just want to make one additional comment. And I think unless the Court has questions. And as I understand on the waiver issue, the defendant may only demonstrate one of two different types of prejudice in support of a motion for a transfer of venue, presumed or actual. That's how I understand the law. So I don't think that by fully trying to present the issue of presumed prejudice, but not renewing it again during the jury selection process that we have anyway waived that. I think the issue is certainly squarely before the Court. Was there presumed prejudice and should the Court consider it? So that's how I understand the law. And as the Court asked, I haven't seen any cases that indicate otherwise that there was a waiver. And then the trial judge looks at it and he says, well, there's not enough presumed prejudice. And I'm going to examine the jurors. We can reverse only if we are convinced that the presumed prejudice was such that the trial judge was wrong when he said that the jurors were probably telling the truth. I don't think you have to find that there was presumed prejudice in this case. I think there's certainly – I think we have established presumed prejudice. But I think you could find that the Court should have considered this public opinion survey in more depth. And I think if we had the opportunity, we could have – well, I think we have shown presumed prejudice. But I don't think you have to go that far. I think you could remand this case – reverse this conviction and remand back to the district court for a new trial. And then we may have to revisit this issue on whether there is still that prejudice in the community or not. But I don't think that you necessarily have to find presumed prejudice. I think it's here. I think we've established it. But let me understand that. The initial magistrate report took into consideration the survey, but then it gets fully finalized and the magistrate takes it into account again and recites various things. Government has various objections to the methodology. But it's all out there for the judge. I'm not aware that a hearing is required at that point. Well, I think that – But you're suggesting that we would remand it now and say, well, there should have been a hearing to consider the report and the objections. And that's now leaving me a little puzzled. Well, no, I'm saying that you could find that there's presumed prejudice in this case and reverse the conviction on that basis because there's a denial of due process. But you're saying we don't have to find that. We can just remand it and say there should have been a hearing. Well, no, I think it was an abuse of discretion to deny the hearing, to deny the continuance, and to deny any of the procedures. Why was it an abuse of discretion to deny a hearing when you had all of the evidence in front of you, including the methodology and judges deal with surveys all the time? Well, because I think the judge basically denied our motion for a change of venue before we even had the final report filed. And then the judge reviewed it later and basically said, well, I don't change my mind. But I think that we had the opportunity to present the experts who conducted the public opinion survey before the district court in order to convince the district court of the reality of this presumed prejudice. In other words, it's easier to convince someone before they've made up their mind without having the full amount of the evidence in front of them than to have to go back and ask that they reconsider and find out. Absolutely. If there are no other questions, thank you for your time. Thank you. The matter will stand submitted.
judges: Pregerson, Canby, McKeown